## S93A1621. O'NEAL v. WILKES.
(439 SE2d 490)

</div>

FLETCHER, Justice.

In this virtual adoption action, a jury found that appellant Hattie O'Neal had been virtually adopted by the decedent, Roswell Cook. On post-trial motions, the court granted a judgment notwithstanding the verdict to appellee Firmon Wilkes, as administrator of Cook's estate, on the ground that the paternal aunt who allegedly entered into the adoption contract with Cook had no legal authority to do so. We have

---

reviewed the record and conclude that the court correctly determined that there was no valid contract to adopt.

O'Neal was born out of wedlock in 1949 and raised by her mother, Bessie Broughton, until her mother's death in 1957. At no time did O'Neal's biological father recognize O'Neal as his daughter, take any action to legitimize her, or provide support to her or her mother. O'Neal testified that she first met her biological father in 1970.

For four years after her mother's death, O'Neal lived in New York City with her maternal aunt, Ethel Campbell. In 1961, Ms. Campbell brought O'Neal to Savannah, Georgia, and surrendered physical custody of O'Neal to a woman identified only as Louise who was known to want a daughter. Shortly thereafter, Louise determined she could not care for O'Neal and took her to the Savannah home of Estelle Page, the sister of O'Neal's biological father. After a short time with Page, Roswell Cook and his wife came to Savannah from their Riceboro, Georgia home to pick up O'Neal.[1] Page testified that she had heard that the Cooks wanted a daughter and after telling them about O'Neal, they came for her.

Although O'Neal was never statutorily adopted by Cook, he raised her and provided for her education and she resided with him until her marriage in 1975. While she never took the last name of Cook, he referred to her as his daughter and, later, identified her children as his grandchildren.

In November 1991, Cook died intestate. The appellee, Firmon Wilkes, was appointed as administrator of Cook's estate and refused to recognize O'Neal's asserted interest in the estate. In December 1991, O'Neal filed a petition in equity asking the court to declare a virtual adoption, thereby entitling her to the estate property she would have inherited if she were Cook's statutorily adopted child.

1. The first essential of a contract for adoption is that it be made between persons competent to contract for the disposition of the child. *Winder v. Winder*, 218 Ga. 409 (128 SE2d 56) (1962); *Rucker v. Moore*, 186 Ga. 747, 748 (199 SE 106) (1938). A successful plaintiff must also prove:

> "Some showing of an agreement between the natural and adoptive parents, performance by the natural parents of the child in giving up custody, performance by the child by living in the home of the adoptive parents, partial performance by the foster parents in taking the child into the home and treating [it] as their child, and . . . the intestacy of the foster

---

[1] Mr. and Mrs. Cook were divorced in the 1970s. The former Mrs. Cook did not testify at trial.

parent."

*Williams v. Murray*, 239 Ga. 276 (236 SE2d 624) (1977), quoting *Habecker v. Young*, 474 F2d 1229, 1230 (5th Cir. 1973). The only issue on this appeal is whether the court correctly determined that Page was without authority to contract for O'Neal's adoption.

2. O'Neal argues that Page, a paternal aunt with physical custody of her, had authority to contract for her adoption and, even if she was without such authority, any person with the legal right to contract for the adoption, be they O'Neal's biological father or maternal aunts or uncles, ratified the adoption contract by failing to object.

As a preliminary matter, we agree with O'Neal that although her biological father was living at the time the adoption contract was allegedly entered into, his consent to the contract was not necessary as he never recognized or legitimized her or provided for her support in any manner. See *Williams*, 239 Ga. 276 (mother alone may contract for adoption where the father has lost parental control or abandoned the child); OCGA § 19-7-25, Code 1933, § 74-203 (only mother of child born out of wedlock may exercise parental power over the child unless legitimized by the father); see also OCGA § 19-8-10 (parent not entitled to notice of petition of adoption where parent has abandoned the child). What is less clear are the rights and obligations acquired by Page by virtue of her physical custody of O'Neal after her mother's death.[2]

3. The Georgia Code defines a "legal custodian" as a person to whom legal custody has been given by court order and who has the right to physical custody of the child and to determine the nature of the care and treatment of the child and the duty to provide for the care, protection, training, and education and the physical, mental, and moral welfare of the child. OCGA § 15-11-43, Code 1933, § 24A-2901. A legal custodian does not have the right to consent to the adoption of a child, as this right is specifically retained by one with greater rights over the child, a child's parent or guardian. OCGA § 15-11-43, Code 1933, § 24A-2901 (rights of a legal custodian are subject to the remaining rights and duties of the child's parents or guardian); *Skipper v. Smith*, 239 Ga. 854 (238 SE2d 917) (1977) (right to consent to adoption is a residual right retained by a parent notwithstanding the transfer of legal custody of the child to another person); *Jackson v. Anglin*, 193 Ga. 737, 738 (19 SE2d 914) (1942)

---

[2] This issue was alluded to but not decided in *Foster v. Cheek*, 212 Ga. 821, 824-825 (96 SE2d 545) (1957). In that case, it was not necessary to decide whether grandparents with physical custody of a child were competent to contract with their daughter's second husband for the adoption of their daughter's child because their daughter, the child's mother, ratified the adoption contract.

(parent retains exclusive authority to consent to adoption although child is placed in temporary custody of another); *Carey v. Phillips*, 137 Ga. App. 619, 624 (224 SE2d 870) (1976) (parent's consent is required for adoption of child although child is in physical custody of another).

O'Neal concedes that, after her mother's death, no guardianship petition was filed by her relatives. Nor is there any evidence that any person petitioned to be appointed as her legal custodian. Accordingly, the obligation to care and provide for O'Neal, undertaken first by Campbell, and later by Page, was not a legal obligation but a familial obligation resulting in a custodial relationship properly characterized as something less than that of a legal custodian. Such a relationship carried with it no authority to contract for O'Neal's adoption. See *Skipper*, 239 Ga. at 856. While we sympathize with O'Neal's plight, we conclude that Page had no authority to enter into the adoption contract with Cook and the contract, therefore, was invalid.

4. Because O'Neal's relatives did not have the legal authority to enter into a contract for her adoption, their alleged ratification of the adoption contract was of no legal effect and the court did not err in granting a judgment notwithstanding the verdict in favor of the appellee. See *Foster v. Cheek*, 212 Ga. 821 (96 SE2d 545) (1957) (adoption contract made between persons not competent to contract for child's adoption specifically enforceable where the parent with parental power over the child acquiesced in and ratified the adoption contract).

*Judgment affirmed. All the Justices concur, except Hunt, P. J., and Carley, J., who concur in the judgment only; Sears-Collins and Hunstein, JJ., who dissent.*

SEARS-COLLINS, Justice, dissenting.

I disagree with the majority's holding that O'Neal's claim for equitable adoption is defeated by the fact that her paternal aunt was not a person designated by law as one having the authority to consent to O'Neal's adoption.

1. In *Crawford v. Wilson*, 139 Ga. 654, 658 (78 SE 30) (1913), the doctrine of equitable or virtual adoption was recognized for the first time in Georgia. Relying on the equitable principle that "equity considers that done which ought to have been done," id. at 659; see OCGA § 23-1-8, we held that

> an agreement to adopt a child, so as to constitute the child an heir at law on the death of the person adopting, performed on the part of the child, is enforceable upon the death of the person adopting the child as to property which is undisposed of by will.

Id. We held that although the death of the adopting parents precluded a literal enforcement of the contract, equity would "enforce the contract by decreeing that the child is entitled to the fruits of a legal adoption." Id. In *Crawford*, we noted that the full performance of the agreement by the child was sufficient to overcome an objection that the agreement was unenforceable because it violated the statute of frauds. Id. at 658. We further held that

> [w]here one takes an infant into his home upon a promise to adopt such as his own child, and the child performs all the duties growing out of the substituted relationship of parent and child, rendering years of service, companionship, and obedience to the foster parent, upon the faith that such foster parent stands in loco parentis, and that upon his death the child will sustain the legal relationship to his estate of a natural child, there is equitable reason that the child may appeal to a court of equity to consummate, so far as it may be possible, the foster parent's omission of duty in the matter of formal adoption.

Id. at 660.

Although the majority correctly states the current rule in Georgia that a contract to adopt may not be specifically enforced unless the contract was entered by a person with the legal authority to consent to the adoption of the child, *Crawford* did not expressly establish such a requirement, and I think the cases cited by the majority that have established this requirement are in error.

Instead, I would hold that where a child has fully performed the alleged contract over the course of many years or a lifetime and can sufficiently establish the existence of the contract to adopt, equity should enforce the contract over the objection of the adopting parents' heirs that the contract is unenforceable because the person who consented to the adoption did not have the legal authority to do so.[3] Several reasons support this conclusion.

First, in such cases, the adopting parents and probably their heirs know of the defect in the contract and yet voice no objection to the contract while the child fully performs the contract and the adopting parents reap the benefits thereof. Under these circumstances, to hold

---

[3] I am in favor of the requirement that private adoption contracts be entered by someone with the legal authority to consent to the adoption of a child, as such a person is probably more likely to look after the child's best interests than someone who does not have such authority. However, the fact that such a person did not initially consent to the adoption should not be an absolute bar to an action for equitable adoption. Instead, the focus in equitable adoptions should be on the equities that arise from the time the agreement is made to the time the equitable adoption action is brought.

that the contract is unenforceable after the child has performed is to permit a virtual fraud upon the child and should not be countenanced in equity. See 2 Corbin on Contracts, p. 469, § 429 (1950). Equity does not permit such action with regard to contracts that are initially unenforceable because they violate the statute of frauds, but instead recognizes that the full performance of the contract negates its initial unenforceability and renders it enforceable in equity. See 2 Corbin, supra, §§ 420, 421, 429, 432; *Harp v. Bacon*, 222 Ga. 478, 482-483 (1) (150 SE2d 655) (1966). Moreover, the purpose of requiring consent by a person with the legal authority to consent to an adoption, where such a person exists, is to protect that person, the child, and the adopting parents. See generally Clark, The Law of Domestic Relations, Vol. 2, Sec. 21.11 (2nd ed. 1987). However, as equitable adoption cases do not arise until the death of the adopting parents, the interests of the person with the consent to adopt and of the adopting parents are not in jeopardy. On the other hand, the interests of the child are unfairly and inequitably harmed by insisting upon the requirement that a person with the consent to adopt had to have been a party to the contract. That this legal requirement is held against the child is particularly inequitable because the child, the course of whose life is forever changed by such contracts, was unable to act to insure the validity of the contract when the contract was made.

Furthermore, where there is no person with the legal authority to consent to the adoption, such as in the present case, the only reason to insist that a person be appointed the child's legal guardian before agreeing to the contract to adopt would be for the protection of the child. Yet, by insisting upon this requirement after the adopting parents' deaths, this Court is harming the very person that the requirement would protect.

For all the foregoing reasons, equity ought to intervene on the child's behalf in these types of cases, and require the performance of the contract if it is sufficiently proven. See OCGA § 23-1-8. In this case, I would thus not rule against O'Neal's claim for specific performance solely on the ground that her paternal aunt did not have the authority to consent to the adoption.

2. Moreover, basing the doctrine of equitable adoption in contract theory has come under heavy criticism, for numerous reasons. See Clark, supra at 676-678; Rein, Relatives by Blood, Adoption, and Association: Who Should Get What and Why (The Impact of Adoptions, Adult Adoptions, and Equitable Adoptions on Intestate Succession and Class Gifts), 37 Vand. L. Rev. 710, 770-775, 784-786 (1984). For instance, as we acknowledged in *Wilson*, supra, 139 Ga. at 659, the contract to adopt is not being specifically enforced as the adopting parents are dead; for equitable reasons we are merely placing the child in a position that he or she would have been in if he or she had

been adopted. See Rein at 774. Moreover, it is problematic whether these contracts are capable of being enforced in all respects during the child's infancy. See Rein at 773-774; Clark at 678. Furthermore, because part of the consideration for these contracts is the child's performance thereunder, the child is not merely a third-party beneficiary of a contract between the adults involved but is a party thereto. Yet, a child is usually too young to know of or understand the contract, and it is thus difficult to find a meeting of the minds between the child and the adopting parents and the child's acceptance of the contract. Rein at 772-773, 775. I agree with these criticisms and would abandon the contract basis for equitable adoption in favor of the more flexible and equitable theory advanced by the foregoing authorities. That theory focuses not on the fiction of whether there has been a contract to adopt but on the relationship between the adopting parents and the child and in particular whether the adopting parents have led the child to believe that he or she is a legally adopted member of their family. Rein at 785-787; Clark at 678, 682.

3. Because the majority fails to honor the maxim that "[e]quity considers that done which ought to be done," § 23-1-8, and follows a rule that fails to protect a person with superior equities, I dissent.

I am authorized to state that Justice Hunstein concurs in the result reached by this dissent.

<div align="center">

DECIDED FEBRUARY 7, 1994 —
RECONSIDERATION DENIED FEBRUARY 25, 1994.

</div>

*Charles W. Bell,* for appellant.
*Richard D. Phillips,* for appellee.